Caroline K. Simon, J.
This is a claim for the permanent appropriation in fee of claimants’ land, pursuant to section 30 of the Highway Law, which proceeding is described as Conduit *260 Boulevard, Part 5, S. H. No. 5701A, in Nassau County, Map No. 201-R-l, Parcel No. 226. Prior to the commencement of this trial, upon claimants’ unopposed motion, and pursuant to an order granted by another Judge of this court on January 25, 1966, the parties entered into a stipulation eliminating from their claim that portion of it referring to a permanent easement taken by the State for excavations, embankments and slopes, on Map No. 212, Parcel No. 239.
At the opening of this trial, the parties stipulated to the filing of the maps with the New York State Department of Public Works on November 28, 1960, with the Secretary of State on April 18, 1961, and with the Nassau County Clerk on May 5, 1961.
The claim was timely filed with the Court of Claims on May 2, 1963 and with the office of the Attorney-General on May 3, 1963. On January 21, 1966, trial of this action was commenced before another Judge of the Court of Claims, but due to the illness of claimants’ appraiser, the trial was interrupted. Upon motion of the Attorney-General, and pursuant to court order, interest upon any award for this claim was suspended from January 21 to March 10,1966, the first day of the new and completed trial of this action. Apart from this interrupted start, the claim has neither been assigned nor submitted to any other court or tribunal for audit or determination.
The court adopts the description of the appropriated property as shown on the map and description filed in the office of the Nassau County Clerk, a copy of which is attached to the claim anddncorporated herein by reference.
Claimants submit proof of ownership of the property by means of a bargain and sale deed dated November 14,1952, from George Stratigos, grantor, to Constantine and Blaine Vanech, grantees, recorded in the office of the Nassau County Clerk on November 18, 1952 in Liber 5049 at page 530.
The property was located in the Village of Massapequa Park. Prior to the appropriation, it consisted of 11,739± square feet of land, improved with three buildings. At the southwest corner of Sunrise Highway and Lake Shore Drive, a three-pump gasoline station with service building had been erected in 1933. This was a nonconforming use antedating the village’s zoning regulations. At the time of the taking, claimants were receiving an annual rental of $2,200 for this portion of their property. A memorandum extending the gas station lease had been signed by the operator to whom the lease between claimants and tenant had been assigned.
*261 This lease included an agreement that new tanks would be installed underground, and that the gasoline supplier would pay increased taxes, and an option to renew at increased rent. The tenant continued to operate the gas station until road construction bulldozers appeared on the property.
A two and one-half story stucco building with a one-story extension was located 80 feet west of the corner, and was rented as a restaurant-bar and grill, at an annual rental of $3,600. There was a third building, a small frame garage, at the rear of the property, in which a planing shop operated. With claimants’ oral permission, the shop paid rent to the bar lessee after October, 1957, as did a plumbing contractor and employment agency which also used the premises.
Claimants had constructed a concrete parking slab to end conflicts between their tenants over parking space essential to both operations.
The property was zoned Business Gr, and its highest and best use prior to the taking was as a gasoline station, a nonconforming use, and as commercial property. After the taking, the remainder also had its highest and best use as commercial property, though a smaller parcel, and not large enough to attract a major gas station, nor to be used as a gas station.
On December 4,1961 the Board of Trustees of the village condemned the gas service station structure as being unsafe and beyond repair, pursuant to section 89 (subd. 7-a, par. f) of the Village Law. The structure was demolished in 1964.
The State’s taking was for the purpose of widening Sunrise Highway. The taking consisted of a long, narrow strip of land running parallel to the highway, varying in width from 15 feet to 27 feet at its extremities, and ranging in length from 128 feet on the highway side to 134 feet on the interior. It measured 2,150 square feet or ,049±acre in area.
The taking also appropriated three gasoline pumps located on the strip, as well as the front portion of the bar and grill building, which included the concrete parking slab and restaurant sign.
The claimants’ appraisal was based upon the theory that, though it was one plot under one ownership, it should be separated for evaluation purposes and appraised as two pieces of land, each with a separate license from a governmental authority, and with distinct uses and leases to two separate tenants, and should, therefore, be evaluated as two pieces.
The State took the position that the parcel should be evaluated as one tract.
*262 Claimants’ appraiser assigned a before value of $36,000 to the commercial part, which included the bar-restaurant, of which sum he attributed $18,700 to the land, and $17,300 to the building.
He appraised the before value of the gas station portion at $27,900, of which $27,400 was assigned to the land, and $500 to the building.
The State’s appraiser and claimants’ appraiser agreed and the court finds that $63,900 represented the fair and reasonable value of the entire property before the taking.
Claimants’ appraiser, in his assessment of damage, used the capitalization of income approach, and assumed that the original uses of the land were no longer possible after the State’s taking, that the improvements thereon were rendered economically valueless and a total loss to claimants, and that it was unfeasible to restore the remaining property to its full original use.
The State offered no evidence of its own appraisal of the property.
Claimants, as part of their proof, offered in evidence a seven-year lease with a tenant, covering the premises occupied by the bar and grill. This lease was entered into on October 11, 1957, and provided for an annual rental ranging from $2,700 at the beginning, and gradually increasing over the term of the lease to $3,900. When the State’s taking cut away the front of the building, claimants constructed a new entrance and sign, and an altercation ensued between claimants and their tenant. Thereafter, the latter’s rent was reduced during the construction period and a new agreement was entered into, setting the rent at $3,600 per year for the last three years of its term. Shortly thereafter, on June 29, 1961, claimants sold the property for $40,000, of which $30,000 constituted a 5%% purchase-money mortgage for 20 years. Mr. Vanech testified that his wife had been asking $100,000 for the property prior to the taking, and that both of them had been so disturbed by the various aspects of the appropriation procedures that they decided to accept the next offer that ‘ ‘ came along ’ ’, and that they did so at a price less than the true value of the property.
Structural improvements to claimants’ gas station property were delayed due to the pending condemnation. Claimants received their first notice of the taking when, having heard rumors of the impending acquisition, Mr. Vanech one year e.arlier visited the Department of Public Works and was assured that there would be no taking.
*263 Then, in April he received notice to the contrary and an offer of partial payment was made, requiring no demolition on his part. This was executed, but no payment was made.
Thereafter, claimants received an offer of partial payment which included a requirement that they demolish. This latter offer was executed on April 28, 1961 by claimants, and executed by the State on June 1,1961.
On June 23, 1961, the Department of Public Works returned with a requirement that claimants remove the encroachment into the acquisition of several feet of the bar and grill. Still no payment had been made.
On June 8, 1962, almost one year later, claimants received a letter from the Department of Public Works informing them that a death in the Department had caused the delay in processing the matter and on June 20, 1962 they received on unexecuted copy of the agreement asking for further demolition. No partial payment was ever received, though on July 2, 1963 the 1961 agreement was approved.
Mr. Vanech stated that this sequence of events made him eager to get out of any situation involving the State and to sell the property at the next opportunity.
The proposed permanent easement (see claimants’ Exhibit 10) never vested because claimants agreed to do their own demolition of the front of the building, and did so. When a bulldozer and crane appeared unannounced on the corner of claimants’ property, Mr. Vanech, then still the owner, telephoned the Department of Public Works, and was granted a few days in which to “ straighten things out ”, which time he used to dispossess the tenant of the bar and grill, who agreed to leave without process because of a condemnation clause in his lease as well as an agreement reached before a Judge that claimants would take off the front of the building as required by the State, then build a new entrance and front, and a new parapet for the restaurant’s sign. Tenant’s rent was reduced while construction was going on and a new agreement was signed between claimants and the bar and grill lessee. The plans drawn for the reconstruction did not suit the tenant, and during the ensuing “ bickering ” claimants sold the property by deed dated July 29,1961, consideration being received July 31, 1961.
Mr. Vanech stated that he received the offer on a Friday morning, and accepted it because he was ‘ not happy with State or tenant ” and on Friday afternoon he had the contract.
Before the sale, claimants had done the minimum amount of work on the bar and grill, only having moved the water pump and some plumbing. Thereafter, the front was demolished, a *264 new front built, and a small addition attached to the rear of the building. About two years later, the tenant bought the building.
It is claimants’ contention that their sale did not represent the fair and reasonable market value of the property at the time, since it included the value of the gasoline service station permit for one part of the property, and the liquor license held by the operator of the bar and grill, and the discounted value of the purchase-money mortgage, and reflected the special knowledge of a real estate developer for whom grantee acted as “ dummy ”, all of which inflated the sum paid.
The State, on the other hand, argues that the sales price is the most compelling evidence of value at the time, and should receive the utmost weight in assessment of damages. Claimants’ appraiser admitted that the gas station permit was no longer useable after the taking of the pumps and the subsequent demolition of the service station as ordered by the village.
The court finds, on all the facts, that the property should be considered as one entity. It further finds that the claimants suffered an unfortunate series of events in connection with the taking, but that the sale of the property for $40,000 was by a willing seller to a willing purchaser.
The court believes the sum awarded claimants meets the standard set in law and texts. “ The value of a property to its owner is simply a positive expression, in monetary terms, of the entire injury which an owner would suffer if he were to be deprived of the property.” (1 Orgel, Eminent Domain, § 14, pp. 74, 75.)
Market value, which is to be the standard used, is deemed to be the price at which the owner might actually have sold the property at or about the time of taking, and in the instant claim there actually was such a sale. A willing seller is deemed to be a person not compelled to sell. There was no evidence, despite claimants ’ difficulties with the appropriating authority and their tenants, that they were forced to sell in a great hurry without taking a reasonable time to find the most favorable buyer and to negotiate the best bargain with such a buyer.
Matter of 860 Fifth Ave. Corp. v. Tax Comm. of City of N. Y. (8 N Y 2d 29, 31 [1960]): “Time was when evidence was excluded of sales of the subject property or of comparable properties for the reason that vendor or purchaser might have made a bad bargain (Matter of Thompson, 127 N. Y. 463, 468; Ettlinger v. Weil, 184 N. Y. 179). The selling prices of specific parcels could only be elicited on cross-examination of expert witnesses who had given opinion evidence of market value (Robinson v. New York El. R. R. Co., 175 N. Y. 219). Actual sales do not *265 reflect market value where made under stress, but it came to be realized that they furnish valuable evidence of market value if consummated between willing buyers and sellers under ordinary market conditions. Accordingly, Robinson v. New York El. R. R. Co. (supra) was overruled in Village of Lawrence v. Greenwood (300 N. Y. 231) which held that evidence of specific sales is admissible on direct examination under such conditions. ’ ’
Matter of City of New York (A. & W. Realty Corp.) (1 N Y 2d 428,433 [1956]): “ In a case such as the one before us, there can be no doubt that the trial court, and the Appellate Divison as well, are bound by the testimony in the record. (Administrative Code of City of New York, § B15-19.0; see People ex rel. Uvalde Asphalt Paving Co. v. Seaman, supra, 217 N. Y. 70, 74.) This does not mean, however, that an award may never be higher or lower than the experts’ estimates of value; it is only requisite that there be evidence at hand to support the value actually found by the court. If, for instance, on the day before the taking the property had been purchased for a price below the lowest figure suggested by the City, and if other testimony were present establishing the sale as a fair indication of value, a court would be warranted in selecting a figure lower than that given by the expert. It is not, though, ‘ at liberty to find an arbitrary sum not sustained by any evidence in the record. ’ (People ex rel. Hallock v. Hennessy, 152 App. Div. 767, 770.) ”
The court recognizes that the property suffered damage, but finds that this was offset to a degree by the benefit accruing to it from the improved road with its increased traffic flow.
“ Consequential damages to the remaining property must be offset to the extent that such property has been benefited by the improvements ” (Brand v. State of New York, 21 A D 2d 727, 728 citing Esso Std. Oil Co. v. State of New York, 9 A D 2d 840, 841; Matter of City of New York [Exterior St.], 285 N. Y. 455, 461; Bohm v. Metropolitan El. Ry. Co., 129 N. Y. 576, 595; Newman v. Metropolitan El. Ry. Co., 118 N. Y. 618, 624). “ We believe it is well settled that general benefits as well as benefits special or peculiar to the premises in question may be deducted against any consequential damages ” (Saxton v. New York El. R. R. Co., 139 N. Y. 320; Bohm v. Metropolitan El. Ry. Co., supra).
The court finds the before value of the property to be $63,900, the after value to be $40,000 and the direct damage to be $23,900. Any consequential damage is balanced by the benefits mentioned above. To this sum should be added interest from May 5, 1961 to November 5, 1961, from May 2, 1963 to January 21, 1966, and from March 10,1966 to the date of entry of judgment herein.
*266 The court has viewed the property and the comparables offered by the parties. Claimants’ attorney has asked the court to make certain inferences based upon the fact that, though an appraiser sat with the Attorney-General in the courtroom during the two days of the trial, he was not called upon to testify.
The court has reached its decision based upon the evidence placed before it, giving proper weight and consideration to the testimony and the comparables viewed. No single element was controlling.